MARGARET M. SULLIVAN, Ex'x. *vs.* MARY V. DOLAN *et al.*

FEBRUARY 8, 1944.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J.   This is a suit in equity, brought by the complainant, as executrix of the will of her deceased sister Annie Deignan, against Mary V. Dolan and Rhode Island Hospital Trust Company, a banking corporation, hereinafter generally referred to as the respondent bank.

The substantial relief sought in the bill of complaint is that the complainant as such executrix be declared to be the true owner of a certain savings account in that bank, entitled "Annie Deignan or Mary V. Dolan Payable to either or to the survivor", existing under that title at the death of Annie Deignan and then amounting to $6843.42; and that the bank be ordered by a decree to deliver and pay over such account to the complainant as such executrix.   It is alleged in the bill "that the name of the respondent, Mary V. Dolan, together with the words, 'payable to either or the survivor' was added to said account recently for the sole convenience of said Annie Deignan".   No other ground for the relief sought is alleged.

The respondent Dolan in her answer admits an allegation in the bill that she is a grandniece of the complainant and also of Annie Deignan. She puts the complainant upon proof of all the other allegations of the bill. It is not in dispute that the complainant was the sister of the decedent. The respondent bank in its answer states that for many years prior to April 11, 1940, there was on deposit therein an account in the sole name of Annie Deignan and that on that date the account was changed to read as stated in the bill of complaint. But it does not admit that the change was made for the sole convenience of Annie Deignan and that on her death it became a part of her estate.

After the case had been heard upon its merits before a justice of the superior court, testimony being taken and exhibits filed, the trial justice filed a rescript in which the evidence and the law considered by him to be applicable thereto were discussed. In conclusion he stated that the respondent Dolan had failed to satisfy him "that Mary Deignan on April 11, 1940 intended in praesenti to divest herself of the exclusive ownership and control over the deposit in the Rhode Island Hospital Trust Company representing her own funds, and to vest the ownership and control of said funds jointly in Miss Dolan."

In accordance with this decision a final decree was later entered in which it was determined that the fund in question was the fund of Annie Deignan and that upon her death it became a part of her estate, to be administered according to law; and that the trust company was authorized and directed to pay that fund, with accumulated interest, to the complainant in her capacity as executrix of the last will and testament of Annie Deignan. The case is now before us on an appeal by the respondent Dolan from that decree, on the grounds that the decision was erroneous and against the law; and that the decree, based upon the decision, was against the evidence and the law. The following facts were clearly shown by the evidence introduced at the hearing of the case upon its merits in the superior court.

Annie Deignan, who never married, was about seventy-five years old on March 22, 1942, the date of her death in the city of Providence at the Charles V. Chapin Hospital, hereinafter referred to as the Chapin Hospital. She had been employed for many years as a domestic servant in the home of a Miss Newcomb in this city until the death of the latter in 1932; and thereafter she was the life beneficiary of a trust fund of $25,000 established by Miss Newcomb.

Then for two or three years she resided in an apartment on Bowen street in this city, near Benefit street. Thereafter until her last illness she lived in three rooms in an apartment house on the latter street, being in good health during that period, attending to her own household and business affairs, and usually spending a considerable part of each summer on Block Island. She was frugal and had established substantial savings accounts in three banks in Providence, these being the respondent bank, the Peoples Savings Bank and the Citizens Savings Bank, the amounts in them respectively at the time of her death being $6843.42, $3176.83 and $4555.22.

Until Miss Deignan went to live on Benefit street this respondent Dolan, hereinafter referred to as Miss Dolan, had little or no acquaintance with her. Soon afterwards Miss Dolan was informed that Miss Deignan was living there alone in an apartment and would no doubt be glad to see her there. She acted upon the suggestion and called upon Miss Deignan; and thereafter they were very friendly, at least until the latter's mind was seriously affected during her last illness.

In the meantime Miss Dolan was usually at Miss Deignan's home two or three times a week, when the former's duties as a public school teacher would permit, sometimes accompanied by her mother or brother or a sister-in-law. She performed many little services for her aunt at the latter's home, helping her to make over garments, taking her to places in the former's automobile and the like, but never transacting any business for her. In the summer of 1939 Miss Deignan lived for two weeks with Miss Dolan and the

latter's father and mother in a hotel on Block Island which Miss Dolan operated.

Until Miss Deignan's last illness Miss Dolan never drew for her any money from any of the bank accounts above described; but the former attended to her own business with the banks as well as her other business matters. She usually went downtown in a taxicab, if she had any business to attend to there, because walking for any considerable distance was difficult for her, on account of an injury suffered by her during the hurricane of 1938. Otherwise her physical condition seems to have been good.

The uncontradicted testimony of Miss Dolan as to the change in the bank account was as follows: Miss Deignan, near the end of 1939 or in January 1940, said to her: "Mary, I am giving you a gift of my account at the Hospital Trust . . . and I want you to come down with me so I can get it fixed so you can have it." She added that it was cold then and she would like to go down when the weather was a little better. Soon after Easter in 1940 Miss Dolan, at the request of Miss Deignan, went in her own automobile to the latter's home at about 9:30 o'clock in the forenoon and took the latter downtown to do some shopping. After that was attended to, they went to the savings department of the respondent bank. There Miss Deignan introduced her to a clerk and said to the latter: "I want you to put her name on my account." The clerk brought an order slip for that purpose and filled it out. Then it was signed by Miss Deignan and filed with the bank. It was introduced in evidence at the hearing in the superior court and reads as follows:

"Authority To Add Name To Savings Account

Apr 11 1940

Rhode Island Hospital Trust Co.

Dear Sirs:

Please add the name of Mary V. Dolan to Savings Account No. 27297 making the title to read: Annie Deignan or Mary V. Dolan.

Payable to either or to the survivor.

Yours very truly,

Annie Deignan".

The clerk then brought a signature card and Miss Dolan signed it and it was filed with the bank. This is an exhibit in the case and reads as follows: "I hereby agree to the rules and regulations of the Rhode Island Hospital Trust Company relating to the Savings Department now or hereafter in force." Then follows the signature of Miss Dolan and her address and the words "Occupation Teacher."

The bankbook was then and there changed so as to read as follows: "No. 27297 Rhode Island Hospital Trust Co. in account with Annie Deignan or Mary V. Dolan Payable to either or to the survivor." Then Miss Deignan said to her: "Mary, we won't have any trouble with the book. The bank is to hold the book and when you want money you come and get it and when I want money I will come and get it. It is your money and you can spend what you want."

Miss Deignan then signed and filed with the bank an instrument which, at the hearing of the case, was introduced as an exhibit. It is dated April 11, 1940 and addressed to the bank. The first part reads as follows:

"Gentlemen:

I hand you herewith Savings Book described below which I ask you to hold for me temporarily at my risk, to be delivered only to me or upon my written order. Book No. 27297

Balance of account when book was deposited $7,257.66".

All of this except the date, the number of the book and the amount of the balance of the account is in print. Below this appears in typewriting: "Annie Deignan or Mary V. Dolan" Then, below this, stamped in red ink, are the following words: "It is also agreed that the book may be delivered to the other person named as depositor in the book or upon the written order of that person." Then follows the signature of Annie Deignan. After she had signed this, Miss Deignan drew out of the account $60.98, which, as the bankbook shows, was the interest accrued for the period ending October 31, 1940. She and Miss Dolan then returned to Miss Deignan's home.

Thereafter during Miss Deignan's lifetime the bankbook remained in the bank, with no further change in the title of the account or as to the custody of the book or as to its delivery to Miss Deignan or Miss Dolan.

As to the ownership of the account, the name first shown on the book is "Annie Deignan." Following that, on the same line but in different ink and different handwriting, appear the words "or Mary V. Dolan". Then below that are stamped the words "Payable to either or to the survivor." Under date of April 11, 1940 a withdrawal of $60.98 appears. The bank records show that this was paid to Annie Deignan.

Miss Dolan's mother, Bridget Dolan, testified that at one time, about two months after the change was made in this account, during one of her frequent calls on Miss Deignan, the latter said to her: "I gave Mary a gift of my money that is in the Hospital Trust. . . . Yes, B, nobody knows the kindness your daughter Mary brought me since Miss Newcomb died."

No evidence was introduced which showed or indicated that the addition by Miss Deignan of the name of the respondent Dolan to this account was the result of the exercise of undue influence by the latter over the former, nor is any such influence charged in the bill of complaint. On the contrary, the only allegation made in the bill of complaint as a ground for the claim that the account is now a part of the estate of Annie Deignan is "that the name of the respondent, Mary V. Dolan, together with the words, 'payable to either or the survivor' was added to said account recently for the sole convenience of said Annie Deignan".

According to the uncontradicted testimony of Miss Dolan she drew $100 out of this account on July 30, 1940, without saying anything to Miss Deignan beforehand, and gave it to her brother for his tuition in college; and in September of the same year she drew out a like sum for the same purpose. After each of these withdrawals she told Miss Deignan about it and what she had done with the money; and Miss Deignan told her that she needn't run to Miss Deignan about the

withdrawals of money that was her own. Miss Dolan, on June 7, 1941, made a withdrawal of $72.75, being accrued interest, and used a part of it for a graduation present for her brother. On October 25 of the same year she made a deposit of $10 of her own funds.

On November 13 of that year Miss Deignan drew out the interest credited on the account and amounting to $36.33 and said to Miss Dolan: "Mary, I was downtown and I went to the bank and I drew my interest." From this withdrawal of accrued interest and the last previous one it would be reasonable to infer that they were drawing the accrued interest alternately. On February 2, 1942, Miss Dolan drew from the fund $200 and used about $75 of it in paying expenses incurred during Miss Deignan's last illness. The rest of the $200 she used for her own expenses. This was the last withdrawal. The bankbook shows all these withdrawals and the deposit of $10; and the bank records show by whom they were made.

Uncontradicted evidence shows that during the time when Miss Deignan lived at the apartment house on Benefit street she saw nothing or practically nothing of any of her relatives except the Dolans, though during the short period when she was confined to her room at the Chapin Hospital during her last illness she saw a great deal of her sister, the complainant, who had been informed of her illness by the Dolans and who, during the last preceding period of two and one half years, had seen her only twice.

So far as appears from the evidence in the case, Miss Deignan continued in good health until about the middle of January 1942, when her last illness began and she was taken by Miss Dolan, in the latter's automobile, to the Rhode Island Hospital, where she was attended by Dr. Wing. Miss Dolan visited her there and she seemed very sick. A little later Mrs. Dolan was notified by Dr. Wing that he could no longer attend Miss Deignan and that she must leave the hospital.

Miss Dolan then brought her back to the apartment on

Benefit street and arranged with a Miss Kilkenny, who had a room in the same apartment house and had often called on Miss Deignan during the last few years, to come down and help take care of her. Miss Dolan and her mother also assisted. Miss Kilkenny called in Dr. O'Connell to see Miss Deignan and, on his advice, she was taken to the Jane Brown Hospital, where she was under the care of Dr. McCaffrey, who had not previously known the Dolans.

He examined Miss Deignan there on February 8, 1942 and at the hearing of this case in the superior court testified that he found that she was suffering from arteriosclerosis, heart disease and kidney disease; and as to her mental condition, he found that "she was confused, disoriented and resistive to examination", and in his opinion was of unsound mind. Therefore he certified her to the Chapin Hospital for observation and treatment for mental disorder; and she was on that day transferred to the psychiatric department of that hospital, where she remained, as a private patient of his, until her death on March 22, 1942. He visited her there on eleven days in February and on nine days in March, the last one being the 22d. On each of these visits he examined her and her condition.

On the day when she was transferred to the Chapin Hospital, but before the transfer was made and after he had examined her at the Jane Brown Hospital, he called together her relatives who were at the latter hospital, the complainant, her son, and Mary Dolan and her mother, and told them that Miss Deignan was of unsound mind and needed care in a mental hospital. He testified that after that time there was a progressive physical and mental deterioration in her condition down to the time of her death; that during that period she was in no condition to carry on a coherent and coordinated conversation with anyone or to transact any business; and that it was his opinion that she never had any lucid interval when she was at the Chapin Hospital.

Miss Dolan, at the hearing in the superior court, introduced in evidence a deposition which, under the order of a

justice of the superior court, had been taken on February 24, 1942 of Dr. Kiene, who was director of the psychiatric department of the Chapin Hospital. In this he testified that Miss Deignan was definitely of unsound mind, when she was admitted to that hospital, and had continued to be so to the time when the deposition was taken; and that she was not of sufficient understanding to transact business and was never in complete control of her mental faculties. The testimony of the two physicians was not contradicted or impugned in any way.

On February 9, 1942, the complainant signed and filed a petition for the appointment of a guardian of the person and estate of Miss Deignan on the ground that she was "a person of full age, a person of unsound mind, who from want of discretion in managing her estate, so spends, wastes or lessens her estate", etc. A similar petition for the appointment of a conservator of the estate of Miss Deignan had been filed just before by Miss Dolan's mother. Neither of these petitions was acted upon before Miss Deignan's death.

The principal testimony in behalf of the complainant was given by herself and concerned statements which she said Miss Deignan had made to her at the Chapin Hospital during Miss Deignan's last illness. The testimony was as follows: "She told me these Dolans the parties was up there and wanted her to sign a paper so they could have the bank book in the Hospital Trust. And she said, 'I did not give Mary Dolan charge of my bank book only to accommodate me'. . . . And she said, 'I gave her an order to cash the checks because I wasn't able to go to the bank.' She said, 'I always had to hire a cab because I wasn't a healthy woman'. . . . She told me the book was in the Hospital Trust." Yet the complainant testified also that Miss Deignan told her that in the month before she went to the Chapin Hospital she took a taxi and drew her interest on her accounts in the Peoples Savings Bank and the Citizens Savings Bank.

Two men who were sons of a brother of Miss Deignan but who had not seen her for a great many years and whose

interests were adverse to Miss Dolan's, were the only witnesses who gave any support to the testimony of the complainant as to the account in issue in this case. One of them testified that Miss Deignan told him at the Chapin Hospital that the principal cause of her being there was that she was irritated on account of trouble with Mary Dolan over a bankbook in the Rhode Island Hospital Trust Company which "she allowed Mary Dolan to take sometime previous for the purpose of making withdrawals or deposits at a time when she wasn't able to go to the bank"; that she told him that Miss Dolan had been at the hospital with a paper for her to sign as to that bankbook; that Miss Deignan asked him for advice as to what to do with her money and he gave her such advice; and that after Miss Deignan's death the complainant told him that Miss Deignan had made a will leaving everything to her and that she, the complainant, "expected the entire thing would be divided equally."

The other of the two nephews of Miss Deignan testified that he saw her at the Chapin Hospital after the first week of March and afterwards; and that she told him that she was having trouble with Mary Dolan and that she had Mary Dolan's name on the book "so she could go down from time to time to make withdrawals and pay her bills. But it was not her intention of giving her the bank book."

The above mentioned Miss Kilkenny testified that in the early part of 1940 she saw Miss Deignan in the apartment at least three times a week and up to March 1942 and that Miss Dolan and her mother "never left there" and "substituted each other." She said that Miss Deignan told her quite a few times that "they wore her out". She also testified that she called on Miss Deignan at the Chapin Hospital during the latter's last illness and heard her say to Mrs. Sullivan that "Mary Dolan came in and that she asked her to bring in her bankbook and her keys to her apartment and Mary didn't come up since." We see no basis for a finding that this statement concerned the account in the respondent bank. Nor can we see that any of Miss Kilkenny's testimony sup-

ports the decision of the trial justice.

Because of the mental condition of Miss Deignan while she was at the Chapin Hospital, as shown by the testimony of Dr. McCaffrey and Dr. Kiene, which was not contradicted or impugned in any way, and because of the obvious financial interest which the complainant and her two nephews had in the matter of the account in dispute in this case, we are convinced that the trial justice was not justified in drawing any inference favorable to the complainant from anything that happened at the hospital.

The records of the respondent bank show, as above stated, that more than a year after the change had been made in the account Miss Deignan made a withdrawal for herself; and there was nothing to discredit the testimony of Miss Dolan that she never made any withdrawal for the benefit of Miss Deignan until the latter was at the Chapin Hospital and unable to go out. Moreover, it was clearly shown by the testimony of the assistant treasurer of the Citizens Savings Bank that Miss Deignan withdrew from her account in that bank $200 on November 4, 1940 and $200 on June 16, 1941.

After consideration of all the evidence on the subject we are of the opinion that it clearly shows that until her last illness Miss Deignan, except for her lameness, which caused her to take taxicabs in order to get downtown, was able to attend to, and did attend to, all her business affairs, including her business with the banks.

The trial justice, in his rescript, after stating the rule, as to an asserted gift of a so-called "joint interest" in a bank account, that the burden is on the claimant to establish, by satisfactory evidence, that the donor intended *in praesenti* to divest himself of the exclusive ownership and control of the account and to vest them jointly in the claimant, added the following: "This rule is especially applicable where the alleged donee is in a position of trust and confidence."

Later in his rescript he stated: "Where an alleged donee occupies a relationship of trust and confidence with an alleged donor, the burden of proof is placed upon the donee to

show that the gift was not procured by fraud and undue influence." He cited three Rhode Island cases as supporting this statement of law. Still later he stated, as among the facts that must be realized, in applying the above-stated law to the facts in this case, "that despite the love and affection Miss Dolan professed for Miss Deignan, Miss Dolan attended neither the wake nor the funeral of Miss Deignan; that Miss Dolan admits a relation of trust and confidence between her and Miss Deignan."

We can find no such admission in Miss Dolan's answer or testimony and we are convinced, after a careful examination of the pleadings and evidence and of the brief filed in this court for the complainant, that neither the issue of undue influence nor the matter of a relation of trust and confidence between the parties is in any way involved in the case.

As to the matter of the nonattendance of Miss Dolan at the wake and funeral for Miss Deignan we cannot see that this has any relevancy to the only issue involved in this case, which is that of the donative intent of Miss Deignan in creating this bank account claimed by the complainant.

In view of the errors which we have above pointed out in the rescript of the trial justice, we can give little weight to his final decision in this case. And after careful consideration of all the evidence we are convinced that it cannot reasonably be found therefrom that the name of Miss Dolan was added by Miss Deignan to the bank account in question, together with the words "payable to either or the survivor", for the sole convenience of Miss Deignan, as stated in the bill of complaint as the *only ground* for the relief sought by the complainant.

On the contrary, we are of the opinion that it was established by satisfactory evidence that Miss Deignan on April 11, 1940 intended *in praesenti* to divest herself of the exclusive ownership and control of her account in the respondent bank and to make that account payable either to herself or to the respondent Mary V. Dolan or to the survivor of them. We are also convinced that it then became so pay-

able; and that it remained so until the death of Miss Deignan, when it became payable solely to the respondent Mary V. Dolan.

We are therefore of the opinion that a final decree should be entered to the effect that the fund in question became, on the death of Annie Deignan, the sole property of the respondent Mary V. Dolan, and ordering the respondent bank to pay it over to her.

The appeal of the respondent Mary V. Dolan is sustained and the decree appealed from is reversed.

On February 16, 1944, the parties may present to this court for approval a form of decree to be entered in the superior court in accordance with this opinion.

*Daniel A. Colton, Thomas B. Sullivan,* for complainant.
*Hogan & Hogan, Edward T. Hogan,* for respondents.