267 A.2d 706.

INDUSTRIAL NATIONAL BANK OF RHODE ISLAND, *Trustee u/w of* GERTRUDE E. GUITERAS *vs.* HAROLD GUITERAS *et al.*

JULY 17, 1970.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

Powers, J. This civil action was brought by the surviving and now sole trustee under the will of Gertrude E. Guiteras. The complaint avers that, for reasons hereinafter fully stated, the trustee is unable to administer the charitable fund in accordance with the expressed wishes of the testatrix. It prays that, subject to notice to all proper parties, the Superior Court approve administration of the trust in accordance with *cy-pres* principles.

Notice was duly served on the Attorney General, the known heirs at law and a guardian ad litem appointed. The Attorney General, answering, admitted plaintiff's standing as trustee and certain facts averred in the complaint; claimed insufficient knowledge of other facts averred but prayed that the court decree the continued existence of the trust.

All other defendants answering denied that *cy-pres* was appropriate and prayed, in essence, that the action be considered by the court as one brought by the trustee for construction of and instructions under the will. So postured,

it was heard by a Superior Court justice on complaint, answers and proof.

When the cause was ready for hearing and entry of final judgment in the Superior Court, it was certified to this court pursuant to the provisions of G. L. 1956 (1969 Reenactment) §9-24-28.

The record compiled in Superior Court establishes that Gertrude E. Guiteras died testate on December 30, 1940, and her will was admitted to probate by the Bristol Probate Court on February 3, 1941.

By the terms of the residuary clause, paragraph 33 of her will, the testatrix created a trust which involves three separate funds—namely, A, B and C respectively. Fund A makes provisions for the support of testatrix's housekeeper during her lifetime as well as making certain discretionary provisions for the family of Ramon Guiteras' use of the family homestead. This fund consists of said family homestead and furnishings together with a corpus of $10,-000, the interest of which is payable to said housekeeper during her lifetime. With her death, the principal of $10,-000, together with any accumulated interest, passes to the corpus of Fund C. The homestead and contents also pass to Fund C at a stated time or sooner within the discretion of the trustee.

Fund B consists of a corpus of $50,000, the proceeds from which are payable forever to the Town of Bristol but are only to be used by the Town of Bristol for the maintenance and repair of the Guiteras school building previously erected in memory of testatrix's mother with funds provided by testatrix's brother. Other than for what assistance the establishment of Fund B may afford in gathering testatrix's dominant charitable intent as expressed in her will, said Fund B is not involved in these proceedings.

Fund C consists of all the rest, remainder and residue of testatrix's estate, which now represents something in ex-

cess of $990,000. It is for the construction of and instruction under the terms of the trust contained in Fund C that the cause was certified to this court. The pertinent language in paragraph 33 thereof reads as follows:

"* * * then to segregate, separate and set aside the remainder of my intangible personal property not included in said 'Fund A' and 'Fund B' hereinbefore provided for and they, my said trustees or the survivor of them, shall be the sole judge of the propriety, justice and equality thereof and said separation, without the assent or approval of any court, join therewith all surplus of the income of the Bristol real estate included in the residue of my estate after paying the charges and expenses incident to the maintenance of my homestead estate hereinbefore provided for, all said real estate after the final and permanent termination of the authority and right of granting permission to occupy my homestead estate as heretofore provided, my said homestead estate and all the tangible personal property owned by me and wheresoever located, not specifically bequeathed herein, to designate said property as 'Fund C' and hold the same separately, to invest and reinvest the same and keep the same invested, to collect the rents, income, dividends and profits arising therefrom and, after paying out of said rents, income, dividends and profits all taxes and assessments that may be levied thereon and all charges and expenses incident thereto and to the management thereof, including a reasonable compensation to my said trustees, or the survivor of them, for their services as trustees not only of said 'Fund C' but also for their services as trustees of all the trusts created in this, my Last Will and Testament, to pay over semi-annually on the first business day of January and July in each year forever, or, if in the judgment of my said trustees or the survivor of them, the better results will be attained thereby, to apply for the support, maintenance and general purposes thereof or for the purchase of books written in either the Spanish or English language or both therefor, forever the net amount of said rents, income, dividends and profits

arising from said 'Fund C' to such free public library or libraries now existing or that may be hereafter established in the City of Matanzas, in the Republic of Cuba, as my said trustees or the survivor of them may determine and select and if they shall select more than one library as a beneficiary hereof, they, my said trustees or the survivor of them, are hereby authorized to determine the proportions in which said net income, rents, dividends and profits shall be divided and applied among them and they may vary said proportions from time to time, my said trustees being the sole judge of the propriety thereof without the assent or approval of any court, and, as I am making this donation in memoriam of my father, the late Ramon Guiteras, it is my wish that in some way his name may be connected and associated publicly and permanently therewith and I direct my said trustees or the survivor of them to see that my said wish is accomplished, and if, at any time, there shall be no free public library operating and functioning in said City of Matanzas in a way satisfactory to my said trustees or the survivor of them, and they, my said trustees or the survivor of them, shall be the sole judge thereof, without the assent or approval of any court, then to pay over to or to apply for the general purposes thereof, the said net amount of said rents, income, dividends and profits of said 'Fund C' in the possession of my said trustees or the survivor of them on said dates and at said times to such other institution or institutions as may be operating and functioning in said City of Matanzas for charitable purposes such as a hospital or other institution providing care and treatment for poor and worthy persons as my said trustees or the survivor of them may determine, and they, my said trustees, or the survivor of them, shall be the sole judge of such selection and determination of said beneficiary or beneficiaries without the assent or approval of any court, and I direct my said trustees, or the survivor of them, to see that the name of my father, Ramon Guiteras, continue to be associated with said donation throughout."

From the record compiled in Superior Court it appears that the then trustees administered the fund and commenced operating a library in 1951. It was not until that year that Fund C consisted of substantial assets. In that year testatrix's trustees appointed certain distinguished citizens of the Town of Matanzas to serve as a local board of directors, which board was designated as the "Patronato." With funds supplied exclusively by testatrix's trustees, the "Patronato" built up a collection of books that were kept at a borrowed site which was used as a library. These books were loaned to children and young adults.

In 1955, again with funds exclusively provided by testatrix's trustees, the "Patronato" constructed a new library building, which faced the central park and was known as the Ramon Guiteras Library. For the next five years this library's collection of books was steadily expanded so that there was eventually a total collection of more than 12,000 books, 90 per cent of which were in the Spanish language and the remaining 10 per cent in English.

At this point the trustees' problem took root. In January 1959, Fidel Castro assumed control of Cuba by revolutionary means; and shortly thereafter, the "Patronato" began to experience governmental harassment. American magazines were removed along with anti-government books, and government propaganda texts were substituted. Further, the Guiteras Library was usurped by government officers for political meetings.

This was initially commenced by peaceful means, but it is clear from the testimony of certain witnesses that the usurpation of the Guiteras Library was accomplished by a show of armed force. Indeed, guns were mounted on the roof of the library and its janitor, armed with a machine gun, wore a military uniform. Moreover, at the time of the Bay of Pigs invasion in April 1961, Dr. Escarzaga, who

was a former librarian of the library, was taken into custody and confined to a concentration camp for five days on suspicion of harboring pro-American sympathies. Further, Dr. Escarzaga testified at the hearing held in Superior Court that he believed that a valuable part of the Guiteras Library collection was transferred to Russia in exchange for arms.

In any event, on June 7, 1961, Castro, by decree, announced control over all education in Cuba through a Ministry of Education. It is undisputed that a principal function of said ministry is the absolute control of all libraries in that country.

As a result thereof, according to the testimony of Dr. Escarzaga, based upon information received from hundreds of emigrants from Matanzas, all the books were removed from the Guiteras Library, and the building itself became a Communist social club.

This was the state of affairs when in February 1962, then President John F. Kennedy issued proclamation No. 3447, declaring an embargo on all goods, wares and merchandise to Cuba, an executive order still prevailing.

It would appear that subsequent to the Bay of Pigs incident and prior to the presidential proclamation, income from Fund C could not be used to supply magazines and books to the Guiteras Library, which, for all practical purposes, was no longer functioning. Curtis B. Brooks, senior vice-president of trustee's bank trust department testified, however, that money continued to be forwarded to those members of the "Patronato" who were still in Cuba until late in 1962. These funds, he further testified, were used in part to assist Guiteras family members and loyal members of the "Patronato" to come to the United States.

Uncertain as to the propriety of forwarding funds subsequent to the Presidential proclamation, the witness Brooks communicated with the U. S. State Department, and as a

result of the State Department's suggestion, funds were no longer forwarded to Cuba. Thus, in late 1962, the trustee ceased to administer the trust.

On information received from and at the urging of emigrees from Matanzas currently in the United States, the trustee permitted interest from Fund C to accumulate in the event that the situation in Cuba would improve favorably towards carrying out the testatrix's purposes.

However, when in 1968 it became manifest that there was no foreseeable prospect of resuming operations of the Ramon Guiteras Library, the trustee began to consider an alternative program which, by way of recourse to the *cy-pres* doctrine, would permit the use of the income from the trust for other charitable purposes, preserving the corpus against the day when operation of the Guiteras Library could be resumed.

Specifically, witness Brooks testified, the trustee bank concluded that to prevent further accumulation of income and at the same time approximate the testatrix's wishes, income from the trust might well be paid to the International Rescue Committee, Inc., which, trustee had been advised, could assist indigent citizens of Matanzas. Accordingly, the trustee bank filed the instant complaint.

However, all respondents were not agreed as to the beneficiaries of the trust, resulting from a determination that the charitable intent was specific. Considerable evidence was adduced in the Superior Court bearing on the testatrix's paramount concern with the Guiteras family name. In the view we take of the testatrix's dominant charitable intent, the conflicting claims of the Guiteras heirs require neither discussion nor consideration.[1]

---

[1] When the cause was orally argued here the question arose as to whether this court should adopt a "wait and see" policy with regard to the distribution of Fund C by reason of the circumstances which, presently prevailing in Cuba, make it impossible for the trustee to administer the fund in the manner expressly desired by the testatrix. Such a policy, if otherwise

All parties are in accord with the well-settled principle that the *cy-pres* doctrine is not applicable unless the testatrix's dominant charitable intent is general. Neither are they in substantial disagreement with that canon of construction which holds  that, if at all possible, the dominant intent is to be determined from the provisions of the will, but that extrinsic evidence may properly be considered by the court where the intention is not so determinable. *Carpenter* v. *Smith,* 79 R. I. 326, 89 A.2d 168; *Egavian* v. *Egavian,* 102 R. I. 740, 232 A.2d 789; *Manufacturers Nat. Bank* v. *McCoy,* 100 R. I. 154, 212 A.2d 53; *R. I. Hospital Trust Co.* v. *Bateman,* 93 R. I. 116, 172 A.2d 84; *Industrial Nat. Bank* v. *Drysdale,* 83 R. I. 172, 114 A.2d 191; *Industrial Trust Co.* v. *Saunders,* 71 R. I. 94, 42 A.2d 492.

While these principles are easily stated, the possible conflict in application is clearly made to appear from a reading of two leading cases in this jurisdiction — namely *R. I. Hospital Trust Co.* v. *Williams,* 50 R. I. 385, 148 A. 189, and *Gladding* v. *St. Matthew's Church,* 25 R. I. 628, 57 A. 860. In both cases extrinsic evidence was used, although in *Gladding* the charitable intent was found to be specific,

sound, would look to a deferring of distribution until some reasonable time in the future when conditions in Cuba might not render the testatrix's stated wishes incapable of fulfillment.

. In compliance with the expressed wish of this court, all parties filed supplementary briefs as to the advisability of our adopting a "wait and see" policy. Insofar as such briefs and our independent research disclose, the question is novel in this jurisdiction. Moreover, it would appear that there is a parcity of pertinent authority elsewhere.

Be that as it may, after due deliberation, we are constrained to conclude that here where no doubt exists as to the inability of the trustee to administer Fund C in accordance with the specifically expressed directions in the will, which inability results from conditions not temporary in nature, the ends of justice will not be served by deferring to some indeterminate time resolution of whether the settlor's dominant charitable intent was specific, so that the trust fails, or general, in which case the trust will continue to be administered by the trustee under the supervision of the Superior Court in accordance with *cy-pres* principles.

while in *Williams* the court found the charitable intent to be general. Here, an examination of Gertrude Guiteras' will discloses a total of eleven specifically designated charitable beneficiaries.

Fund A in said paragraph 33 has been heretofore delineated and requires no further discussion. Moreover, it is a gift to a faithful household domestic and is without significance in determining whether Fund C of paragraph 33 evinces a general or specific charitable intent. Again, Funds B and C have been fully set forth and need not be otherwise repeated. With regard to the remaining eight charitable dispositions we deem it desirable to include them as an appendix to this opinion.

An examination of each of the provisions of the will discloses that, while testatrix made numerous special bequests to next of kin and employees in the total sum of $74,000, as well as specific bequests of jewelry, value unknown, and devised certain realty in Matanzas of unstated value to a Dr. Alberto F. Guiteras, a resident of that city, the overwhelming bulk of her real and personal estate, in excess of $500,000, was either bequeathed or devised to divers charities. (See appendix.) We find this persuasive of the proposition that testatrix's dominant intent with regard to Fund C was of a general charitable nature, falling within the rationale of *R. I. Hospital Trust Co.* v. *Williams, supra.*

Conceding that the extrinsic evidence establishes, as certain defendants argue, that testatrix's charitable munificence evinces concern that the Ramon Guiteras name be perpetuated, we are unable to agree that this concern discloses a specific rather than a general charitable intent with regard to Fund C. We perceive no difficulty in the trustee honoring testatrix's concern for perpetuation of the Guiteras name, if, unable to give effect to testatrix's express direction, recourse is had to administering a trust *cy-pres.* Rather, it is our opinion that in Fund C testatrix intended

a general charitable purpose grafting thereon her direction as to the preferential manner in which her charity was to be effectuated. See *Industrial Trust Co.* v. *Nolan,* 74 R. I. 178, 59 A.2d 542. That the specifically expressed manner for the carrying out of her general charitable intent would become impossible of fulfillment was, of course, not within Gertrude Guiteras' contemplation as of the time she drew her will, but there is nothing novel in this. It is self-evident that no charitably minded person would choose as a conduit for his bounty a specifically designated charity which to the knowledge of the donor would subsequently prove incapable of fulfillment.

Thus in IV Scott, *Trusts* §399.2 at 3094 (3d ed. 1967) the eminent text writer states: "Indeed, it is ordinarily true that the testator does not contemplate the possible failure of his particular purpose, and all that the court can do is to make a guess not as to what he intended but as to what he would have intended if he had thought about the matter." To the same effect, see Bogert, *Trusts* §436 at 424 (2d ed. 1964).

Having determined that when all of the provisions of the will are considered as a whole, Gertrude Guiteras' charitable intent with regard to Fund C was general rather than specific, we conclude that the trust created by Fund C does not fail and is subject to the jurisdiction of the Superior Court for the application of the *cy-pres* doctrine. In that forum it is possible for the income of the fund presently accumulated and hereafter accruing to be applied to such charitable purpose as will generally conform to the testatrix's intent. See *R. I. Hospital Trust Co.* v. *Williams, supra.* So resolved, there remains open the possibility that with changing times and circumstances, Gertrude Guiteras' specifically designated preference may again be carried out.

Accordingly, the parties shall submit for our approval a

form of judgment, conformable to this opinion, to be entered in the Superior Court.

## APPENDIX

*FIFTH*: I give and bequeath unto the Overseers of Harvard College, in the City of Cambridge, in the commonwealth of Massachusetts, in memory of my brother, Dr. Ramon Guiteras, Deceased, the sum of thirty thousand dollars ($30,000), the same to be held by them forever as a permanent capital fund and the income and profits arising therefrom to be used in the Harvard Medical School for the study of genito-urinary diseases and for the improvement and advancement of the treatment and operations for said diseases.

*SIXTH*: I give and bequeath unto the First Congregational Church in Bristol, Rhode Island, the sum of five thousand dollars ($5000), the same to be held by it forever as a permanent capital fund and the income and profits arising therefrom to be used for the general expenses of the said First Congregational Church in Bristol, Rhode Island.

*SEVENTH*: I give and bequeath unto the First Congregational Church in Bristol, Rhode Island, the sum of eight thousand dollars ($8000), the same to be held by it forever as a permanent capital fund and the income and profits arising therefrom to be applied to the payment of the taxes assessed from time to time by the said Town of Bristol upon and the up-keep of the Guiteras Parish House of said First Congregational Church in Bristol, Rhode Island.

*NINTH*: I give and bequeath unto the Trustees of the Rogers Free Library in said Town of Bristol, the sum of five thousand dollars ($5000), the same to be held by them, the said Trustees, and their successors forever as a permanent capital fund and the income and profits arising therefrom to be expended for books, magazines, periodicals, newspapers and other publications for use in the Rogers Free Library in said Town of Bristol.

*TENTH*: I give and bequeath unto the Bristol Female Charitable Society of said Town of Bristol, the sum of five thousand dollars ($5000), the same to be held by it as a

permanent capital fund and the income and profits arising therefrom to be used by it for its general purposes as said Bristol Female Charitable Society and the proper officials thereof may consider best.

*ELEVENTH*: I give and bequeath unto the Bristol Children's Home, a corporation, located in said Town of Bristol, the sum of one thousand dollars ($1000), the same to be held by it as a permanent capital fund and the income and profits arising therefrom to be used by it for its general purposes as said Bristol Children's Home and the proper officials thereof may consider best.

*TWELFTH*: I give and bequeath unto the Bristol Home for Aged Women, a corporation, located in the said Town of Bristol, the sum of one thousand dollars ($1000), the same to be held by it as a permanent capital fund and the income and profits arising therefrom to be used by it for its general purposes as said Bristol Home for Aged Women and the proper officials thereof may consider best.

*THIRTY-SECOND*: I give and devise my lot of land together with all the buildings and improvements thereon situated on the southwest corner of Hope and John Street in said Town of Bristol, and my lot of land situated on the southerly side of John Street, in said Town of Bristol, unto the First Congregational Church in Bristol, Rhode Island, the same to be and remain to it, said First Congregational Church, in Bristol, Rhode Island, and its successors and assigns forever, but upon the express conditions that it shall never be used for commercial purposes and that it shall never be alienated, and, if at any time the said conditions be broken that the said described real estate shall thereupon become a part of my residuary estate hereinafter provided for. I hereby direct my Executors heretofore named to repair and put in suitable condition for occupation as a dwelling the south half of the dwelling house on the lots of land first mentioned in this paragraph within three months from and after the final probate of this, my Last Will and Testament, and that the expense incurred in doing so be borne by and from my estate. It is my wish that said house located on the land at the southwest corner of Hope and John Streets, in said Town of Bristol, be used by said First Congregational Church in

Bristol, Rhode Island, as a parsonage whenever in the judgment of the Trustees of said First Congregational Church in Bristol, Rhode Island, it is practicable to use it for said purpose.

*Hinckley, Allen, Salisbury, & Parson, Stuart H. Tucker, Thomas D. Gidley,* for plaintiff.

*Herbert F. DeSimone,* Attorney General, *W. Slater Allen,* Asst. Attorney General; *Edwards & Angell; Edward F. Hindle, John H. Blish, E. Colby Cameron; Gorham & Gorham, Sayles Gorham; Swan, Keeney & Jenckes, Andrew H. Davis, Jr., Rae B. Condon, Richard B. Carpenter, Conrad M. Cutcliffe,* for defendants.