February 20, 2026

**Supreme Court**

No. 2024-30-Appeal.
No. 2024-31-Appeal.
(PM 22-4462)

Bank of America, N.A., as Trustee of    :
  the Harold W. Wood and Gertrude
   B. Wood Trust, the Marion Law
Trust, the John F. Preston Charitable
  Trust, the E. Russell Richardson
   Trust, and the William F. Sayles
      Endowment Fund

           v.             :

 Peter F. Neronha, Attorney General    :
  of the State of Rhode Island, et al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2024-30-Appeal.
No. 2024-31-Appeal.
(PM 22-4462)

Bank of America, N.A., as Trustee of     :
the Harold W. Wood and Gertrude
B. Wood Trust, the Marion Law
Trust, the John F. Preston Charitable
Trust, the E. Russell Richardson
Trust, and the William F. Sayles
Endowment Fund

                 v.                :

Peter F. Neronha, Attorney General     :
of the State of Rhode Island, et al.

Present:  Suttell, C.J., Robinson, and Lynch Prata, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The respondents, Peter F. Neronha, in his capacity as the Attorney General of the State of Rhode Island, Care New England Health System (CNE), The Memorial Hospital d/b/a The Memorial Hospital of Rhode Island (Memorial Hospital), and Kent County Hospital, appeal from a November 7, 2023 final judgment of the Superior Court.  These consolidated appeals all stem from a civil action in the Superior Court that was commenced by the filing of a verified miscellaneous petition seeking judicial application of the doctrine of *cy*

- 1 -

*près*,[1] which petition was filed by the petitioner, Bank of America, N.A. (Bank of America), in its capacity as Trustee of the Harold W. Wood and Gertrude B. Wood Trust, the Marion Law Trust, the John F. Preston Charitable Trust, the E. Russell Richardson Trust, and the William F. Sayles Endowment Fund. On appeal, the respondents principally contend that the trial justice erred in failing to consider the changing circumstances and evolution relative to the provision of health care services when he designated The Miriam Hospital (Miriam Hospital) as the alternative beneficiary of the above-mentioned trusts in the wake of the closure of the original beneficiary, Memorial Hospital.

For the reasons set forth in this opinion, we affirm the final judgment of the Superior Court.

## I

## Facts and Travel

On July 18, 2022, Bank of America filed a "Verified Miscellaneous Petition" (the miscellaneous petition) for the application of the *cy près* doctrine[2] with respect to five charitable trusts—the Harold W. Wood and Gertrude B. Wood Trust (Wood

---

[1]    The term "*cy près*" is spelled differently in the various filings docketed in this Court and in the authorities cited in this opinion. For the sake of consistency, we ordinarily utilize the spelling "*cy près*" throughout this opinion, even when a different spelling is utilized in the cited source.

[2]    *See* Part IV.B, *infra*.

Trust), the Marion Law Trust, the John F. Preston Charitable Trust (Preston Trust), the E. Russell Richardson Trust (Richardson Trust), and the William F. Sayles Endowment Fund (Sayles Trust). All five trusts named Memorial Hospital as a charitable beneficiary.

In a consent order entered on April 21, 2023, all claims pertaining to the Marion Law Trust were dismissed in view of the fact that that trust had named the Rhode Island Foundation as alternative beneficiary. In a similar fashion, the Sayles Trust is not at issue on appeal because the trial justice found that that trust did not fail, since the settlor's intent could still be carried out. For those reasons, only three of the five trusts originally named in the miscellaneous petition will be discussed in this opinion—*viz.*, the Richardson Trust, the Preston Trust, and the Wood Trust.

**A**

**The Trusts**

**1. The Richardson Trust**

In 1930, as part of his last will and testament, Edmund Russell Richardson executed the Richardson Trust. By way of a specific bequest as well as a residuary clause, the Richardson Trust bequeathed funds to Memorial Hospital. The document establishing the Richardson Trust contains in part the following language:

> "<u>EIGHTH</u>: I give and bequeath the sum of Five Thousand
> Dollars ($5,000) to The Memorial Hospital, located in said
> Pawtucket, to establish a permanent free bed to be known
> as the 'E. Russell Richardson Bed.'

"* * *

"TWELFTH: All the rest, residue and remainder of the property, real and personal, of which I shall die seized or possessed, or over which I shall have any power of testamentary disposition at the time of my decease, I give, devise and bequeath to Rhode Island Hospital Trust Company, IN TRUST, nevertheless, for said Rhode Island Hospital Trust Company, hereinafter referred to as my said trustee, to invest the same and collect all of the income therefrom and, after paying from said income all expenses of administering this trust which are properly chargeable to income, to pay the remaining or net income in manner following, -

"As to one-half of said net income, to pay the same to my said brother, John W. Richardson, at least as often as once in each quarter and in as nearly equal instalments as possible, so long as he shall live, and from and after his decease to pay said one-half of said net income in like manner to said The Memorial Hospital; and as to the other one-half of said net income, to pay the same in manner aforesaid in equal shares to Mrs. May E. Lowe, of said Providence, and the said Edith Perry Hills, so long as they both shall live, and thereafter to pay the whole of said one-half to the survivor of them so long as such survivor shall live, and from and after the decease of said survivor to pay said one-half in like manner to said The Memorial Hospital."

## 2. The Preston Trust

In 1941, John F. Preston executed the Preston Trust. Subsequently, in 1961, the original trust document was amended. The 1961 amendment added Memorial Hospital as a beneficiary and provided the following new language:

- 4 -

"c.     To pay in each year twenty per cent (20%) of the net income of the trust to The Memorial Hospital of Pawtucket, Rhode Island, for the primary purpose of establishing two free beds to be known as the 'Florence H. Preston Free Bed' and the 'Jennie R. Fairbairn Free Bed', and after said Free Beds shall have been established, for the general purposes of the Hospital."

### 3.  The Wood Trust

In 1969, Harold W. Wood and Gertrude B. Wood executed the Wood Trust. The Wood Trust, naming Memorial Hospital as a beneficiary, allocated funds as follows:

"Twenty (20%) per cent thereof to or for the benefit of the Memorial Hospital, of said City of Pawtucket;

"* * *

"The above income shall be applied to the general uses and purposes of the aforesaid corporations * * *.

"In the event that any of the beneficiaries named herein shall cease to exist or to operate in substantially the same manner as they are operating at the time of the death of the last surviving Settlor, or if the control, operation, supervision or management of any of said beneficiaries is taken over in whole or in part directly or indirectly by any form of government or governmental agency, the right of said beneficiary to participate in this Trust shall terminate; and thereupon the Trustee shall in its absolute discretion, determine whether (1) to pay or apply the income of the share which has been so terminated to the remaining beneficiaries of this trust, or (2) to select another charitable institution of a character similar to the original beneficiary located in the Blackstone Valley as the recipient of the income of such share."

Later, in 1971, Gertrude B. Wood executed the "First Amendment to Declaration of Trust." The amendment added the following language:

> "I, Gertrude B. Wood, of the City of Pawtucket, County of Providence and State of Rhode Island, one of the Settlors in that certain Declaration of Trust dated December 17, 1969 between my late husband, Harold W. Wood and myself, said Gertrude B. Wood, as Settlors, and Pawtucket Trust Company as Trustee pursuant to the limited authority to amend said trust reserved unto me in said instrument do hereby exercise the power so reserved so that the list of beneficiaries appearing on page two (2) of said original Declaration of Trust is hereby revised so that the same shall now read as follows:
>
> "* * *
>
> "Fifty (50%) per cent thereof to or for the benefit of said Memorial Hospital."

## B

## Memorial Hospital

The Memorial Hospital is a non-profit corporation that formerly operated as an acute care hospital with its main campus located at 111 Brewster Street, Pawtucket, Rhode Island. The 1901 Articles of Association for Memorial Hospital provide that "[s]aid corporation is constituted for the purpose of erecting, establishing and maintaining in the city of Pawtucket and State of Rhode Island a hospital for the treatment of the sick and of those who may be suffering from accidents or injuries."

In 2013, Memorial Hospital was acquired by CNE, which is affiliated with Kent County Hospital among other institutions. As a result of financial difficulties, Memorial Hospital ceased functioning as a licensed hospital in 2018, at which time it ceased providing inpatient and emergency services. After Memorial Hospital's closure, certain medical office buildings located on the Memorial Hospital campus that had been used for the provision of outpatient services were leased to Kent County Hospital; and outpatient services continue to be provided on the Memorial Hospital campus.

## C

### The Trial

As indicated *supra*, on July 18, 2022, Bank of America filed a "Verified Miscellaneous Petition for *Cy Près* Pursuant to [G.L. 1956] § 18-4-1."[3] The

---

[3]     General Laws 1956 § 18-4-1 provides:

> "In all cases of charitable gifts of real or personal estate, whether by deed or will, where the purposes of the donor cannot be literally carried into effect, a complaint may be filed for a cy pres application of the trust property; and at that time all proceedings, orders, and decrees shall be had and taken in the suit, to carry out the intents of the donor as near as may be, that the charity may not fail, and to this end application as provided may be made in the same complaint for appointment of a new trustee or trustees under or pursuant to the provisions of §§ 18-2-1 — 18-2-8, or under the general equity powers of the court."

miscellaneous petition sought judicial approval of the designation of The Miriam Hospital Foundation[4] and Progreso Latino, Inc. (Progreso Latino) "as permanent substitute beneficiaries of the Trusts to share equally in the percentage of earned income from the trust funds allocated to benefit the vulnerable communities of Pawtucket and the Blackstone Valley that have been adversely affected by the closure" of Memorial Hospital.

In accordance with G.L. 1956 § 18-9-5,[5] Bank of America named the Attorney General as a respondent. Bank of America additionally named CNE, Memorial Hospital, Kent County Hospital, the City of Pawtucket, The Rhode Island Foundation, The Miriam Hospital Foundation, and Progreso Latino as respondents.

In its miscellaneous petition, Bank of America stated that CNE had informed Bank of America that it was CNE's belief "that Kent [County Hospital] is the

---

[4] The Miriam Hospital Foundation and Miriam Hospital are distinct legal entities.

[5] General Laws 1956 § 18-9-5 sets forth the following:

> "The attorney general shall be notified of all judicial proceedings affecting, or in any manner dealing with, a charitable trust, or affecting, or in any manner dealing with, a trustee who holds in trust within the state property given, devised, or bequeathed for charitable, educational, or religious purposes, and who administers or is under a duty to administer the property in whole or in part for these purposes within the state, and shall be deemed to be an interested party to the judicial proceedings."

appropriate alternate beneficiary under the Trusts because it now provides outpatient clinical services in Pawtucket that [Memorial Hospital] once provided as a supplement to its inpatient and emergency services."

Bank of America further made reference in its miscellaneous petition to the report entitled "Community Health and Health Systems Impact Assessment Related to the Closure of Memorial Hospital of Rhode Island" (John Snow Report) issued by the Rhode Island Department of Health (RIDOH). The John Snow Report, which was mainly prepared by the health care consulting firm John Snow, Inc., addressed the long-term impacts of the closure of Memorial Hospital; it also assessed what additional health services would be necessary following the closure of the hospital. According to Bank of America's miscellaneous petition, the John Snow Report indicated that the "impacts of the closure of the Emergency Department at [Memorial Hospital] and of the elimination of primary inpatient care under the [Memorial Hospital] license has fallen most heavily upon the Miriam Hospital, the nearest acute care general hospital to [Memorial Hospital] * * *."

In its miscellaneous petition, Bank of America also made reference to the "Mayor's Advisory Committee" (the Committee)—an advisory committee established by the City of Pawtucket and other stakeholders after the issuance of the John Snow Report. Nine proposals were submitted to the Committee following its formation; the Committee then proceeded to analyze and score each proposal. Bank

of America stated that the Committee ultimately recommended that there should be a "50:50 division of allocated Trust funds as between the two highest scoring proposals: The Miriam Hospital Foundation and Progreso Latino, Inc." It was Bank of America's conclusion that naming The Miriam Hospital Foundation and Progreso Latino as permanent substitute beneficiaries "would most closely honor the intent of the original settlors and meet the standards of *cy près* set forth in * * * § 18-4-1 and established caselaw."

CNE, Memorial Hospital, and Kent County Hospital filed an answer to Bank of America's then-operative miscellaneous petition as well as a counter-petition for *cy près*.[6] The counter-petition specifically asserted that the trusts at issue had "historically benefitted and supported services provided by" Memorial Hospital, "including ambulatory, outpatient and specialty health care services." It further asserted that, since the closure of Memorial Hospital, CNE has continued to provide "largely the same set of outpatient and specialty health care services" at the former Memorial Hospital campus through its Kent County Hospital license. For that

---

[6] CNE, Memorial Hospital, and Kent County Hospital filed their answer and counter-petition in a separate action, PM 20-5772. The counter-petition was eventually consolidated with Bank of America's miscellaneous petition, and both were then assigned to the Providence County Superior Court Business Calendar. Following the consolidation of the petitions, CNE, Memorial Hospital, and Kent County Hospital, on August 9, 2022, also filed an answer in the underlying action. In due course, the counter-petition was withdrawn.

reason, the counter-petition contended that Bank of America should designate Kent County Hospital as the permanent substitute beneficiary of the trusts.

On August 9, 2022, the Attorney General filed an answer to Bank of America's miscellaneous petition, requesting that it be denied. Shortly thereafter, The Miriam Hospital Foundation and Progreso Latino also filed an answer to the miscellaneous petition.

A seven-day bench trial on the consolidated petitions began on July 10, 2023. On October 2, 2023, the trial justice's decision was entered. We relate below the salient aspects of what transpired at the trial, and we summarize the testimony of the various witnesses whose testimony we deem relevant to our resolution of the issues on appeal.

### 1. The Testimony of Christopher Koller

Christopher Koller, an expert in "federal health issues including the history of hospitals and primary care delivery systems," who was retained by the "Common Interest Group,"[7] was the first witness to testify. Mr. Koller stated that he was the president of Milbank Memorial Fund, the mission of which is "to improve population health and health equity by collaborating with decision makers and connecting them to that benefit and experience." He acknowledged that he had been

---

[7] The record indicates that the "Common Interest Group" consists of Bank of America, Progreso Latino, The Miriam Hospital Foundation, and the City of Pawtucket.

- 11 -

asked to provide a summary overview of the history of the nature of the financing of hospital services at the time that the charitable trusts at issue were created. Mr. Koller testified that, before providing that historical perspective and in preparation for his testimony, he had reviewed the trust documents as well as historical documents relative to Memorial Hospital.

It was Mr. Koller's testimony that, in the early 1900s, health care institutions were developed either by the government, Catholic congregations, or secular institutions consisting of leading members of the community—the last of which categories he believed would apply to the founding of Memorial Hospital. He added that those institutions typically had three sources of income: private philanthropy, government payments, or payments directly from the patients themselves. Mr. Koller further testified that the services that were provided at those institutions of a bygone era consisted only of "inpatient care provided in open wards and some cases in private rooms." He noted that, after World War II, hospitals were "continuing to provide inpatient and emergency room services." Of particular significance for the instant case, Mr. Koller testified that it was only in the 1970s and 1980s that hospitals expanded to provide outpatient services. He summarized that there had been a change over time to the effect that hospitals which had previously provided inpatient care became "broader institution[s] providing outpatient care as well."

Turning to the creation of the trusts at issue in this case, Mr. Koller testified that Memorial Hospital "did not provide outpatient services in 1910 or 1930." Referring specifically to the Richardson Trust and the Preston Trust, he testified that it was his understanding that the term "free bed" meant that, pursuant to those trusts, there would be free inpatient services provided at Memorial Hospital. Mr. Koller further explained that the designation "bed" could be understood as being "analogous to a [private] room * * *." In connection with his opinion relative to the donative intent of the settlors of the trusts, Mr. Koller testified that Memorial Hospital was a "general institution" whose role it was to provide inpatient services to anyone regardless of the patient's ability to pay. It was further his belief that the settlors' intent was to see to it that the charitable mission of Memorial Hospital was advanced.

On cross-examination, Mr. Koller acknowledged that the "Articles of Amendment to the Articles of Incorporation of the Memorial Hospital," dated December 9, 1993, expanded its provision of services to include outpatient services. Mr. Koller further acknowledged that he had no personal knowledge of the settlors' donative intent; he stated that his only basis for determining the settlors' donative intent was derived from the trust documents. Additionally, he stated that neither the Richardson Trust nor the Wood Trust limited the use of their funds to the provision of emergency department or inpatient services. Regarding the Preston Trust, Mr.

Koller testified that "once the free beds were established in this trust, then the money was supposed to go for the general purposes of the hospital." He further acknowledged that, after 1993, Memorial Hospital "had as part of its general purposes primary care services and outpatient services."

## 2. The Testimony of Doctor David Gifford

David Gifford, M.D., who was the director of RIDOH from 2005 until 2011, testified as an expert in the area of public health. He testified that he was asked to review the proposals from Progreso Latino; The Miriam Hospital Foundation; and Kent County Hospital as well as the joint proposal from Progreso Latino and The Miriam Hospital Foundation "to see which one better met the RFP intent for using the general funds from the Memorial Hospital." Doctor Gifford identified numerous documents pertaining to the proposals that he considered to be important when he conducted his analysis. He stated that, after reviewing those documents, he concluded that the proposal which "ha[d] the greater likelihood of meeting the unmet needs of vulnerable individuals in the City of Pawtucket and surrounding area" was the joint proposal from Progreso Latino and The Miriam Hospital Foundation. Doctor Gifford further testified that the services which Kent County Hospital's proposal identified were considered outpatient services; he added that such services are not typically a "part of the hospital existence and hospital services" and are not the emergency care services that are typically found "inside a hospital setting."

### 3. The Testimony of Mario Bueno

Mario Bueno, the executive director of Progreso Latino since 2010, testified that Progreso Latino is a community-based organization (established pursuant to Section 501(c)(3) of the Internal Revenue Code) that provides "a variety of programs for the community from early education to older health programs." Mr. Bueno described the services and programs carried out by Progreso Latino, which included but were not limited to behavioral health care.

According to Mr. Bueno, if The Miriam Hospital Foundation and Progreso Latino were to be awarded the trust funds at issue, they "would work collaboratively in terms of serving the community especially their patients." He added that Progreso Latino, in particular, would hire two community health workers who would help patients navigate the health care system and address "social determinants of health." Mr. Bueno further testified that Progreso Latino primarily serves the Blackstone Valley, including Pawtucket and Central Falls, which is where he said that "the majority of Progreso Latino constituents live." He noted that, when Progreso Latino's constituents are in need of emergency care services, they go to Miriam Hospital's emergency department.

On cross-examination, Mr. Bueno testified that Progreso Latino also works with CNE. Mr. Bueno stated that, pursuant to the joint proposal of Progreso Latino and The Miriam Hospital Foundation, Progreso Latino would receive thirty-five

percent of the trust proceeds and Miriam Hospital would receive the remaining sixty-five percent of the proceeds.

### 4. The Testimony of Tina Hamilton

Tina Hamilton, employed by Bank of America as a managing director and a philanthropic executive, next testified at trial. She began by testifying generally about the trusts at issue in this case. Ms. Hamilton described the process which Bank of America utilizes to determine the donative intent of settlors. According to her testimony, that process includes reviewing the governing documents, associated files, and any historic documents. She added that, in this case, Bank of America concluded that the donative intent of the settlors was "to benefit Memorial Hospital as a hospital is defined in the traditional sense, one that performs inpatient care and emergency services."

Additionally, Ms. Hamilton agreed that Bank of America made the determination that the trust documents further demonstrated that "the intent [was] to benefit the residents of Pawtucket and the greater Blackstone Valley community." Ms. Hamilton further testified that, because there was a "gap" as a result of the closure of Memorial Hospital, Bank of America "wanted to figure out what the hospital looked like at the time of these documents * * *." She noted that, in order to comply with the settlors' intent, Bank of America had to discern what hospitals existing at the time of the creation of the trusts "looked like for [the settlors] and

- 16 -

what they were funding and then figure out what that looks like in today's environment."

It was Ms. Hamilton's testimony that she reviewed the John Snow Report, which emphasized that "expanded services are urgently needed particularly by the low income residents formerly served by Memorial Hospital." She also testified that most of the services that CNE provides at the Memorial Hospital campus are not considered to be the type of hospital services that were offered at the time the trusts were created. Ms. Hamilton further testified that she was one of Bank of America's employees who had received and reviewed the proposals, the scoring sheets, and anything else that the Mayor's Advisory Committee might have utilized in making its recommendation. She stated that Bank of America concluded that naming The Miriam Hospital Foundation and Progreso Latino as permanent substitute beneficiaries "would most closely honor the intent of the original settlors and meet the standards of *cy près* set forth in * * * Section 18-4-1 and established case law." Ms. Hamilton additionally stated that, as it relates to the term "free beds," Bank of America's position was that that term referred to "a charitable mechanism that was used to allow people to receive care without the financial burden."

On cross-examination, Ms. Hamilton conceded that she did not look for or locate any obituaries of the settlors. Ms. Hamilton also stated that, while she reviewed all the proposals that the Committee had received, she had only read them

"straight through" once. She further acknowledged that Bank of America did not interview any of the applicants; she also acknowledged that she did not ask questions or request any additional information from the Committee after receiving its package. Ms. Hamilton also testified that she did not review any videos or minutes of the Committee's meetings. Ms. Hamilton testified that, in addition to reviewing the package that Bank of America had received from the Committee, she looked at websites such as "Guide Star," which she characterized as being a website "where we can see tax returns of 501(c) entities, of charitable entities." She added that "it's the same sort of due diligence that we do when we're making grants."

### 5. The Testimony of Denise Brennan

Denise Brennan, a nurse practitioner and the Director of Emergency Services at Miriam Hospital, testified that she is responsible for patient care services in the emergency department at Miriam Hospital. Ms. Brennan stated that, since 2017, the demand for emergency department services with respect to behavioral health has increased by thirty-two percent. She added that there had been a significant increase in the number of behavioral health patients from the Central Falls and Pawtucket areas.

### 6. The Testimony of Lawrence Sullivan

Lawrence Sullivan, who was the chairman of the Mayor's Advisory Committee, submitted an affidavit as his direct testimony; said affidavit was

admitted as a full exhibit at trial without objection. The parties agreed that Mr. Sullivan would be available for the purpose of cross-examination.

On cross-examination, Mr. Sullivan testified that, according to a document entitled "January 5, 2021, minutes," the Committee was in search of a "multi-year proposal that is sustainable in perpetuity." Mr. Sullivan conceded that he had not read the trust documents before becoming chairman, nor did he read them while he was serving as chairman of the Committee. He further acknowledged that the request for proposals issued by the Committee indicated that it sought proposals that would "closely honor the original intent of the donors to those trusts: Providing health-related services needed by the vulnerable community as a result of the closure of Memorial Hospital." Mr. Sullivan agreed that the request for proposals did not state that the intent was to provide hospital-related services. Mr. Sullivan further provided testimony as to the scoring of each proposal.

On re-direct examination, Mr. Sullivan testified that the Committee "ultimately and unanimously" chose the joint proposal of Progreso Latino and The Miriam Hospital Foundation. He added that he personally chose the joint proposal over the other proposals because the joint proposal "filled the gap that each one had with their separate proposal * * *. There was no infrastructure involved because it already existed. It just made so much sense. Each dollar would have gone further with the joint proposal than in any other * * * proposal we had."

Upon the conclusion of Mr. Sullivan's testimony, Bank of America, Progreso Latino, The Miriam Hospital Foundation, and the City of Pawtucket rested.

### 7.  The Testimony of Doctor Joseph Diaz

Joseph Diaz, M.D., who is employed by Brown University as well as by CNE as chief health equity officer, provided testimony on behalf of respondents.[8]  He testified that he had been treating patients at the "Memorial Hospital campus on Brewster Street in Pawtucket" since 2001.  When asked if the primary care services and treatment that he has provided at the Memorial Hospital campus were the same before and after closure of the emergency department of Memorial Hospital, he responded in the affirmative.  Doctor Diaz stated that some of the services at the primary care building have expanded since the closure of the emergency department.

Doctor Diaz further testified that he is involved with the Brown University School of Medicine's internal medicine residency program that operates through Kent County Hospital at the Memorial Hospital campus.  It was his testimony that the residency program is important to the community because it provides primary care services and is "attractive to other physicians who are interested in working in academic settings * * *."  Doctor Diaz further described services that are provided

---

[8]     Doctor Diaz also testified that he is the medical director of Integra, an "accountable care organization," which is "basically a voluntary structure where physicians, hospitals, primary care physicians, [and] specialists come forward to provide better quality care, lower cost care and more efficient care for the patients and providers."

primarily to the Pawtucket and Central Falls communities at the Memorial Hospital campus, including transportation, interpreter services, Medicaid support, and "express care." He added that express care has a role in reducing the number of patients who go to the emergency department because express care is a "way for patients who have acute illnesses or what are often called sick visits to be able to get access to a provider." Doctor Diaz further testified that express care is beneficial for the health care system because it is "less expensive and it's better for the emergency room because it wouldn't be full of patients that aren't emergencies." He described the following other specific services provided at the Memorial Hospital campus: primary care, family medicine, dermatology, rheumatology, cardiology, orthopedics, vascular surgery, cardiovascular surgery consultation, physical therapy, occupational therapy, x-rays, laboratory testing, pulmonary care, diabetes and nutritional services, and behavioral health care. Doctor Diaz testified that the patients whom he treats come predominantly from Pawtucket and Central Falls.

According to Dr. Diaz, certain proceeds from the trusts were used to purchase a mammography machine. He testified that it was important to obtain a mammography machine because breast cancer screening rates were very low in the Pawtucket and Central Falls communities. Doctor Diaz noted that, with the installation of the machine, as well as with the addition of "a community health worker to help do breast cancer screening navigation," there had been an increase in

breast cancer screening rates in the just-referenced communities. Doctor Diaz additionally testified that, if Kent County Hospital were to receive the trust funds, the funds would be used for important services—such as providing "high quality care to the patients in [the] community," "screening eye care for diabetics using remote technology," additional cancer screenings and navigation programs, testing for hypertension, and the "ability to provide blood pressure monitor kits to the patients."

## D

## The Trial Justice's Decision

On October 2, 2023, an exhaustive written decision was entered. The trial justice meticulously described the factual and procedural history of the case, including the relevant language from the trust documents. Turning to the specific trusts, he first found that the Richardson Trust failed for impossibility because the settlor's purpose could not be fulfilled—i.e., the net income from the trust could no longer benefit Memorial Hospital. The trial justice similarly found that the Preston Trust and the Wood Trust failed because the "settlors' intent cannot literally be carried into effect." He concluded that the settlors of all three trusts intended for their charitable donations to benefit Memorial Hospital. At the same time, however, the trial justice did specifically find that all three trusts evidenced a general charitable intent.

Having found that the settlors of the Richardson Trust, the Preston Trust, and the Wood Trust all possessed a general charitable intent, the trial justice proceeded to "invoke *cy près*," and he instructed the trustee (*viz.*, Bank of America) "to redirect the donation to another charity as near as * * * the original intent as possible." (Internal quotation marks omitted.) The trial justice stated that he was not obliged to afford deference to the trustee as to the selection of an alternative beneficiary, and he further stated that he declined to follow the trustee's recommendation.

Referring to Ms. Hamilton's testimony, the trial justice said that he was troubled by the process employed by the trustee, stating that the trustee "did not perform reasonable due diligence prior to formulating its recommendation."

The trial justice observed that the trustee did not contact the applicants that had submitted proposals, did not ask questions about the recommendations of the Mayor's Advisory Committee or request additional information from that body, did not review the Committee's recordings of meetings or the minutes of those meetings, and did not review individual scorecards or verify whether the cumulative scores of the Committee were correct. He further stated that he was particularly unimpressed with the fact that Ms. Hamilton "conducted little research and review of outside evidence," read each proposal only once, and "did not look for, or review, the settlors' obituaries to ascertain their donative intent." Additionally, the trial justice found that the trustee improperly grouped the settlors together in determining

- 23 -

charitable intent. Having carefully reviewed the work performed by the trustee, the trial justice declined to adopt its recommendation.

Similarly, the trial justice declined to adopt the Attorney General's recommendation—largely because the Attorney General had also considered the settlors as a single group rather than examining the intents of the settlors individually.

Beginning with the Richardson Trust, the trial justice found that the settlor "intended to further perpetuate his previous desire to fund gratuitous hospital care, as evidenced by Paragraph Eighth." He also found that the settlor's $5,000 bequest for a "free bed" was intended to cover the costs associated with a patient at Memorial Hospital.

The trial justice reached the same conclusion relative to the Preston Trust, since that "settlor intended to aid the 'general purposes'" of Memorial Hospital—which the trial justice described as being "hospital care at the time, based on testimony and evidence in the record." It was also the trial justice's view that the term "free bed" had the same meaning at the time of the creation of the Preston Trust as it had in the Richardson Trust.

Similarly, the trial justice concluded that "the Wood Trust settlors intended to provide gratuitous hospital care for residents of the Blackstone Valley." He noted that the Wood Trust drew a "geographic circumscription within which an alternative

charitable beneficiary should be located"—namely, another charitable beneficiary located in the Blackstone Valley. The trial justice determined that the language in the Wood Trust and evidence taken from the settlors' obituaries indicate that the Wood Trust settlors had "a strong affiliation with [Memorial Hospital], the City of Pawtucket, and the Blackstone Valley."

The trial justice next reviewed the recommendations of the various parties and ruled that their proposals did not comport with the settlors' donative intents. Because Memorial Hospital "was a *bona fide* hospital providing *bona fide* hospital care" at the time the trusts were created, the trial justice concluded that the alternative beneficiary must be another hospital whose purpose would be the provision of hospital care. He emphasized that neither The Miriam Hospital Foundation nor Progreso Latino are hospitals. He added that their proposed use of the trusts' funds "does not amount to the form of hospital care contemplated by the settlors"— because the testimony at trial established that the proposals contemplated that the funds were to be predominantly used for mental and behavioral health services. In this regard, the trial justice cited to Mr. Koller's testimony that "those with mental or behavioral afflictions were treated in separate institutions."

The trial justice also found that the proposal of CNE, Memorial Hospital, and Kent County Hospital did not align with the settlors' intent. He again credited Mr. Koller's testimony as being "most instructive [as] to the settlors' understanding of

hospital care" in that Mr. Koller stated that hospitals at the time the trusts were created were providing only inpatient and emergency services. The trial justice stated that, before the 1970s and 1980s, outpatient and non-emergency services were offered outside the hospital setting. He concluded that, when the settlors allocated funds to Memorial Hospital, "their donations funded inpatient and emergency care consistent with [Memorial Hospital's] services at the time."

Drawing upon the just-summarized findings and reasoning, the trial justice framed "a scheme *cy près*" relative to the Richardson Trust, the Preston Trust, and the Wood Trust. He ultimately held that "the alternative beneficiary closest to the settlors' original intent is The Miriam Hospital * * *." Accordingly, he directed the "Trustee to apply the net income of the trusts thereto." The trial justice reasoned that Miriam Hospital is a *bona fide* hospital providing *bona fide* hospital care and that, at the time of the creation of the trusts, it appears to have served the same or similar purposes as Memorial Hospital—*viz.*, inpatient and emergency care. The trial justice further found that, had the settlors been aware that Memorial Hospital would close, they likely would have wanted the trust funds to benefit another hospital serving the same or similar purposes as Memorial Hospital.

In specifically addressing the Wood Trust, the trial justice stated that "based on the findings detailed in the John Snow Report, The Miriam Hospital is the best-positioned facility to comport with the geographical boundary set by the Wood

Trust and said trust's charitable purpose." He emphasized that evidence in the record revealed that, following the closure of Memorial Hospital, residents of the Blackstone Valley used Miriam Hospital's emergency department for inpatient and emergency care. The trial justice added that the fact that Miriam Hospital is a "short distance outside of the Blackstone Valley is insufficient to defeat the Wood Trust settlors' predominant intent," and he commented that the short distance is immaterial in light of "modern vehicles, infrastructure, and ambulatory services." The trial justice concluded by finding that, if the settlors of the Wood Trust were to make the choice of either "(1) applying [the] trust *cy près* to another hospital just over the boundary of the Blackstone Valley; or (2) allowing [the] trust to lapse for lack of a suitable alternative beneficiary within the Blackstone Valley, the Wood Trust settlors almost surely would have recommitted the funds in trust rather than let them pass to their heirs-at-law."

### E

### The Subsequent Travel of the Case

Final judgment was entered on November 7, 2023. It reflected the trial justice's decision and, in accordance with that decision, it directed Bank of America to distribute the net income from the trust funds "to the Miriam Hospital for charitable uses consistent with the settlor's intent as indicated in the Decision."

Memorial Hospital, CNE, and Kent County Hospital filed a notice of appeal on November 22, 2023. On November 27, 2023, the Attorney General filed a separate notice of appeal.

## II

## Issues on Appeal

On appeal, respondents argue that, when determining an alternative beneficiary scheme for the trusts at issue, the trial justice erred in focusing on the provision of health care at the time of the creation of the trusts rather than considering modern developments in how health care is provided. The Attorney General posits that, if the trial justice's decision is interpreted as meaning that the funds must be directed only to inpatient and emergency care, then that limitation contravenes the broader general donative intent. CNE, Memorial Hospital, and Kent County Hospital also contend that the trial justice erred when he failed to adhere to the language of the Wood Trust in selecting an alternative beneficiary located in the Blackstone Valley.

## III

## Standard of Review

We review deferentially the factual findings of a trial justice sitting in a nonjury case; we will "not disturb his or her findings unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence

or unless the decision fails to do substantial justice between the parties." *Manchester v. Pereira*, 926 A.2d 1005, 1011 (R.I. 2007) (internal quotation marks omitted). However, we conduct a *de novo* review when considering a trial justice's rulings regarding questions of law. *Id.*

## IV

## Discussion

## A

## The Parties' Contentions

The Attorney General notes at the outset that he is challenging only the designation of Miriam Hospital as the alternative beneficiary of the trusts. He argues that, after the trial justice correctly found that the trusts each established a general purpose of providing hospital care, he erred in undertaking a "secondary review of the charitable purpose of each trust not called for in the law of *cy près* but rather focusing heavily on how a charitable purpose related to [how] 'hospital care' would have been defined and understood at the time that each trust was established." The Attorney General contends that the trial justice erred in engaging in this "secondary analysis" for two reasons: (1) "rigid adherence to historical context goes beyond what the *cy près* test requires;" and (2) "the application of that approach impedes the full charitable benefit of the trust funds." In support of this argument, the Attorney General cites to *Town of Brookline v. Barnes*, 97 N.E.2d 651 (Mass. 1951).

In particular, the Attorney General argues that the trial justice erred in his determination that the use of the funds should be restricted to providing for inpatient and emergency services when the general charitable intent of the settlors was the provision of gratuitous hospital care in a broader sense. Moreover, according to the Attorney General, limiting the scope of the trusts' funds to apply only to inpatient and emergency services impedes the ability "to meet certain gaps in care that were left in the wake of Memorial's closure * * *."

Additionally, the Attorney General asserts that the trial justice failed to consider what the settlors would have wished if they knew of the current health care delivery systems. In other words, he contends that the trial justice did not consider "what the donor would have thought about *present* circumstances [which said donor] never had the opportunity to consider at the time of the gift." (Emphasis in original.) As support for this argument, the Attorney General refers to the holdings in the extra-jurisdictional cases of *Matter of Estate of Vallery*, 883 P.2d 24 (Colo. App. 1993), and *In re Estate of Elkins*, 32 A.3d 768 (Pa. Super. Ct. 2011).[9]

---

[9] We discuss *infra* the opinions in the cases of *Matter of Estate of Vallery*, 883 P.2d 24 (Colo. App. 1993), and *In re Estate of Elkins*, 32 A.3d 768 (Pa. Super. Ct. 2011). However, we consider it worth noting that neither opinion was rendered by the highest court of those states.

Lastly, the Attorney General requests clarification as to whether the funds are to be used solely for the purposes of inpatient and emergency care or if they are to be used for "gratuitous hospital care more generally."

The other respondents—CNE, Memorial Hospital, and Kent County Hospital—advance largely similar arguments. They contend that the trial justice misapplied the legal standard and overlooked material facts by not considering changes in the provision of health care that have occurred over time and by "ignoring the impact these changes would have on the settlors of the Trusts in determining an alternative beneficiary." These respondents indicate that the issue of whether the trial justice should have applied a *cy près* standard that considered the changes in the provision of health care since the trusts were created is an issue of first impression in Rhode Island. They additionally assert that the trial justice erred when he "did not comply with the express terms of the Wood Trust to designate an alternative beneficiary located in the Blackstone Valley and instead designated Miriam [Hospital], in Providence, as the alternative beneficiary."

For its part, the trustee, Bank of America, asserts that the trial justice did not err in his determination that Miriam Hospital's provision of charitable hospital services was as near to what would have been the settlors' intent at the time the trusts were created if they had realized that the original particular purpose could not be carried out. Bank of America points out that the trial justice "analyzed the trust

- 31 -

documents, testimony, and extrinsic evidence presented at trial to determine the settlors' likely donative intent."  It further contends that the trial justice correctly interpreted the term "hospital" in that he considered its primary meaning at the time when the trusts were created.  In the same vein, Bank of America states that, based on the evidence presented at trial, the trial justice did not commit error in concluding that Miriam Hospital is the suitable alternative beneficiary that is closest to the settlors' intent.

In their submission to this Court, Miriam Hospital and The Miriam Hospital Foundation assert that "CNE incorrectly posits on appeal that changed circumstances creates [*sic*] an error of law."  It is the position of Miriam Hospital and The Miriam Hospital Foundation that, based on the language of the trust documents and the conditions at the time the trusts were created, the trial justice made correct factual determinations as to the settlors' intent and correctly applied the law.  In that regard, they argue that, at the time when the trusts were created, hospital care consisted of inpatient and emergency care.

**B**

**The Applicable Law**

This Court has previously made clear that sound public policy favors preventing the failure of a trust created for charitable purposes. *Pell v. Mercer*, 14 R.I. 412, 435 (1884).  Several decades ago, this Court employed admirably terse

language about the importance of upholding a charitable trust when possible. *Id.* ("Though indefinite it is upheld. If it be designed to be perpetual it is perpetuated."). To that end, "if a trust be created for charitable purposes which are too vaguely defined to be executed without further definition, the court itself, if a discretionary power be not lodged elsewhere, will devise a scheme for carrying it into effect." *Id.* at 435-36. And when a trust which has been long in existence ceases to be useful according to its original intent due to a change of circumstances, "it will be reapplied either wholly or in part to some new purpose, as nearly like to the old as possible." *Id.* at 436. When a court engages in that process, it is exercising what is referred to as its "*cy près* jurisdiction." *Id.*[10]

The *cy près* doctrine in Rhode Island is codified in § 18-4-1. Section 18-4-1 provides:

> "In all cases of charitable gifts of real or personal estate, whether by deed or will, where the purposes of the donor cannot be literally carried into effect, a complaint may be filed for a cy pres application of the trust property; and at that time all proceedings, orders, and decrees shall be had and taken in the suit, to carry out the intents of the donor as near as may be, that the charity may not fail, and to this end application as provided may be made in the same complaint for appointment of a new trustee or trustees

---

[10]      The Norman French words "*cy près*" mean "as near," and the phrase "*cy près comme possible*" means "as near as possible." Ronald Chester et al., *Bogert's The Law of Trusts and Trustees* § 431 (May 2025 Update).

> under or pursuant to the provisions of §§ 18-2-1 — 18-2-8, or under the general equity powers of the court."

This Court has previously stated that "[c]*y près* is invoked if it appears that the donor intended that [the donor's] gift be applied to a charitable purpose the general nature of which is so described that it can be inferred that the donor had a general charitable intent." *Industrial National Bank of Rhode Island v. Glocester Manton Free Public Library of Glocester*, 107 R.I. 161, 165-66, 265 A.2d 724, 727 (1970). Therefore, "[a] necessary prerequisite to an application of *cy près* is a determination that the dominant intent of the person or persons creating the charitable trust was general rather than specific in nature." *Nugent ex rel. Saint Dunstan's Day School v. Saint Dunstan's College of Sacred Music*, 113 R.I. 666, 670, 324 A.2d 654, 656 (1974); *see Glocester Manton Free Public Library of Glocester*, 107 R.I. at 166, 265 A.2d at 727.

When applying the doctrine of *cy près*, it is the obligation of the trial justice "to substitute for the named beneficiary another charitable organization which satisfies the original dispositive purpose as closely as possible." *Rhode Island Hospital Trust National Bank v. Israel*, 119 R.I. 298, 303, 377 A.2d 341, 343 (1977). The dominant intent of the settlor is to be gleaned from the provisions of the trust; however, "extrinsic evidence may properly be considered by the court where the intention is not so determinable." *Industrial National Bank of Rhode Island v. Guiteras*, 107 R.I. 379, 387, 267 A.2d 706, 711 (1970). In *Guiteras*, this Court cited

- 34 -

to IV Scott, *Trusts* § 399.2 at 3094 (3d ed. 1976), which states: "Indeed, it is ordinarily true that the testator does not contemplate the possible failure of his particular purpose, and all that the court can do is to make a guess not as to what he intended but as to what he would have intended if he had thought about the matter." *Guiteras*, 107 R.I. at 389, 267 A.2d at 712 (quoting IV Scott, *Trusts* § 399.2 at 3094 (3d ed. 1976)).

When it is the duty of the trial justice to determine an alternative beneficiary and the trial justice is faced with conflicting claims of two or more institutions, he or she must "ascertain which purpose dominate[s] and which of the two institutions would better fulfill that purpose." *Rhode Island Hospital Trust National Bank*, 119 R.I. at 304, 377 A.2d at 344. In reviewing a trial justice's development of a *cy près* scheme that accomplishes the general charitable purpose of a settlor, we have been influenced by the following suggested framework:

> "In framing a scheme the court will consider evidence as to what would probably have been the wish of the settlor *at the time when he created the trust* if he had realized that the particular purpose could not be carried out. The court will consider not only the language of the trust instrument, but also *such circumstances as indicate what would have been the probable desires of the settlor*, such as the character of the charitable gifts previously made by him, the charities in which he had expressed an interest, his religious affiliations, his views on social, economic and political questions, and the like." Restatement (Second) *Trusts* § 399(d) (1959) (October 2024 Update) (emphasis added).

- 35 -

# C

## Analysis

The parties do not dispute the following conclusions that were reached by the trial justice: (1) that the purposes of the trusts were frustrated by the closure of Memorial Hospital; (2) that the settlors expressed a general charitable intent; and (3) that the doctrine of *cy près* should apply so that the administration of the trusts can continue. For that reason, our analysis will focus only on respondents' challenge to the trial justice's designation of Miriam Hospital as the alternative beneficiary of the trusts at issue in this case.

As previously mentioned, it is our view, based on our close review of the pertinent authorities, that a trial justice must take into consideration what the settlors, if they had realized that the original particular purpose of the trusts could not be carried out, would have wished at the time of the creation of the trusts. *See Guiteras*, 107 R.I. at 389, 267 A.2d at 712 ("Indeed, it is ordinarily true that the testator does not contemplate the possible failure of his particular purpose, and all that the court can do is to make a guess not *as to what he intended but as to what he would have intended if he had thought about the matter*.") (emphasis added) (quoting IV Scott, *Trusts* § 399.2 at 3094 (3d ed. 1976)); *see also City of Providence v. Powers*, 83 R.I. 512, 519, 120 A.2d 811, 814 (1956) (noting that the charitable intent of the donor "was to be gathered from the language of the will itself and not from later

developments and changed circumstances"). Being acutely mindful of those principles, we perceive no error in the trial justice's designation of Miriam Hospital as the alternative beneficiary of the trusts.

In the instant case, the trial justice carefully considered the provisions of each trust and gave close attention to the historical context in which each trust was created. For example, the trial justice was persuaded by Mr. Koller's testimony that services other than inpatient care and emergency services were not part of "hospitals' repertoire until the 1970s and 1980s"—well after the creation of the trusts at issue in this case. He further credited Mr. Koller's testimony that, at the time of the creation of the trusts, the term "bed" in a hospital setting was a "measure of capacity." Moreover, the trial justice underscored that he had not been presented with evidence that, at the time the trusts were created, Memorial Hospital rendered services other than those provided in the hospital as such. The trial justice explicitly found that, at the time of the creation of the trusts, "[Memorial Hospital] was a *bona fide* hospital providing *bona fide* hospital care" and that "the closest alternative beneficiary must be another hospital for the purposes of providing hospital care * * *." Based on our careful review of the evidence in the record, we discern no reason to disturb that ruling.

In ruling that Miriam Hospital is the alternative beneficiary that is closest to the intent of each of the settlors, the trial justice found that Miriam Hospital is a *bona*

*fide* hospital providing *bona fide* hospital care similar to that historically provided by Memorial Hospital.  He also noted that Miriam Hospital was incorporated in 1926—a point in time within the general time period when the trusts were executed. He further found that it is "likely that, during the time of the Subject Trusts, The Miriam Hospital served the same or similar purposes as [Memorial Hospital], which was to provide inpatient and emergency care."  Evidence in the record also reveals that Miriam Hospital (especially its emergency room department) has been most impacted by the closure of Memorial Hospital.

We consider it important to note that the trial justice found that neither the proposal of The Miriam Hospital Foundation and Progreso Latino nor the proposal of CNE and Kent County Hospital comport with the settlors' intent.  The trial justice emphasized that neither The Miriam Hospital Foundation nor Progreso Latino are hospitals specifically providing *bona fide* hospital care.  In addition, he noted that The Miriam Hospital Foundation and Progreso Latino indicated that they intended to use the funds predominantly for mental and behavioral health services, which the trial justice found not to be matters dealt with by hospitals as the settlors would have understood hospitals at the time of the creation of the trusts.  He based that finding on the testimony of Mr. Koller, and he made specific reference to pertinent Rhode Island case law—*viz.*, *Michaud v. Michaud*, 98 R.I. 95, 97, 200 A.2d 7, 7 (1964); *Sullivan v. Dolan*, 69 R.I. 492, 499, 36 A.2d 98, 101 (1944); *Miriam Hospital v.*

*Zoning Board of Review of City of Providence*, 67 R.I. 295, 296, 23 A.2d 191, 192 (1941). We see no reason for disturbing the trial justice's findings in this regard.

Similarly, with respect to the proposal of CNE, Memorial Hospital, and Kent County Hospital, the trial justice found that the evidence presented at trial established that outpatient and other non-emergency services were presently being "rendered outside the hospital setting," whereas at the time the trusts were created, inpatient services and emergency care were the only services rendered at hospitals. This further supports our conclusion that the trial justice undertook a careful and meticulous review of the proposals and that he developed a *cy près* scheme that most closely mirrored the original intent of the settlors.

It is our opinion that the trial justice properly placed himself in the shoes of the settlors of the trusts to determine "not only their original intent but also afford[ing] the possibility of continuing the material purpose for which [the] settlors created enduring legacies of philanthropy benefitting society." Christopher J. Ryan, Jr., *An Historical and Empirical Analysis of the Cy-Près Doctrine*, 48 ACTEC L.J. 289, 335 (2023). The trial justice appropriately considered what each of the settlors, *at the time the trusts were created*, would have intended if they had been made aware of Memorial Hospital's future closing. He rejected the proposition that he should delve extensively into the decades-later changes in the provision of health care as

that would not be helpful in determining the original intent of the settlors. We perceive no error in the trial justice's laudably meticulous analysis.

We have scrutinized the foreign cases brought to our attention by respondents—*viz.*, *Town of Brookline v. Barnes*, 97 N.E.2d 651 (Mass. 1951), *Matter of Estate of Vallery*, 883 P.2d 24 (Colo. App. 1993), and *In re Estate of Elkins*, 32 A.3d 768 (Pa. Super. Ct. 2011).[11] However, there is nothing in those cases that prompts us to alter our reasoning with respect to the instant case.

In *Town of Brookline*, the Supreme Judicial Court of Massachusetts reviewed the recommendation of a court-appointed master concerning an alternative beneficiary of a trust in which the funds were originally designated for the purpose of establishing "a public general hospital." *Town of Brookline*, 97 N.E.2d at 652, 653-56. The Supreme Judicial Court observed that the master's recommendation recognized that, even though a "health center contemplated by the town was not a public general hospital, * * * it was well within the dominant purpose of the testator of aiding the sick of the town especially such of them as are poor, * * * and perhaps more nearly so than the maintenance of a comparatively small public hospital." *Id.* at 654 (internal quotation marks and brackets omitted). The court also noted that

---

[11] As we have previously noted (*see* footnote 9, *supra*), two of the three cited cases are not from the highest court of the respective jurisdictions and therefore would not ordinarily be extensively discussed by this Court. However, because of the importance of the instant case, we have chosen nonetheless to discuss those two cases in some detail.

- 40 -

"[s]uch a health center will apply modern methods of preventive medicine and diagnosis and thus will go far in preventing many residents of the town from becoming hospital cases." *Id.* (deletion omitted).

As had the court-appointed master in that case, the Supreme Judicial Court recognized that a health center is not the same as a public general hospital. *Town of Brookline*, 97 N.E.2d at 656. However, it stated that both have common objectives—*viz.*, "to promote and safeguard the health of the community." *Id.* Importantly, the court also noted that the master, in rejecting the alternative proposal of expanding a small hospital already in existence, found that the alternative proposal was "far from certain." *Id.* The master had concluded that the alternative proposal's "risk of failure [was] too great, when the result might be a serious depletion of the * * * fund" and also would not "sufficiently tend to aid the sick of the town especially such of them as are poor." *Id.* at 654. For these reasons, the court-appointed master recommended that the health center option was preferable. *Id.*

Our reading of *Town of Brookline* does not align with respondents' interpretation of it. We are not convinced that the case stands for the proposition that changes in the provision of health care was the primary determinant in the court's application of the doctrine of *cy près*. Instead, the court in *Town of Brookline* looked to the settlor's dominant purpose—"aiding the sick of the town especially

such of them as are poor"—as opposed to the settlor's "immediate purpose" of establishing a general hospital when designating an alternative beneficiary. *Town of Brookline*, 97 N.E.2d at 655, 656. Significantly, the court was persuaded by the court-appointed master's determination that there were legitimate factors that rendered the alternative proposal less advantageous. *Id.* at 656.

In the instant case, the trial justice also sought to fulfill the dominant purpose of each of the settlors at the time their trusts were created—*viz.*, providing gratuitous hospital care. We therefore are impressed by the trial justice's statement that he could not "reasonably conclude that the settlors donated to a hospital with an intent to fund services that were not provided in hospital settings until decades later." As did the court-appointed master in *Town of Brookline*, the trial justice in the instant case carefully assessed competing proposals and determined that Miriam Hospital is best positioned to fulfill the dominant purpose of each of the settlors.

In its 1993 decision in the case of *Matter of Estate of Vallery*, the Colorado Court of Appeals reviewed a trial court's decision involving a will which had the general charitable purpose of providing for "the cost of hospitalization of such Knights Templar who shall be members of any Commandery in Denver, Colorado * * *." *Matter of Estate of Vallery*, 883 P.2d at 26. The intermediate appellate court affirmed the trial court's ruling, stating that "[i]n view of the ever-expanding aspects of medicine as practiced in hospitals today, * * * continued adherence to the literal

restriction only to pay 'hospitalization costs' would frustrate decedent's general charitable intention to assist financially in the care and treatment of gravely ill, needy Denver Knights Templar." *Id.* at 29. The court viewed this as an "impracticable limitation during the 58 years which have passed since the 1935 will was drafted." *Id.*

The facts of the instant case are distinguishable from those in *Matter of Estate of Vallery*. While the court in *Matter of Estate of Vallery* did consider changes in circumstances, the holding rested on the court's determination that strict adherence to the literal language of the will would frustrate the charitable purpose. *Matter of Estate of Vallery*, 883 P.2d at 29. In contrast to the situation in *Matter of Estate of Vallery*, in the case at bar there are no "impracticable limitation[s]" that would preclude Miriam Hospital from being an alternative beneficiary. On the contrary, the record in this case establishes that Miriam Hospital is providing the same type of health care services as did Memorial Hospital before its closure—namely, inpatient and emergency department care.

Finally, in *In re Estate of Elkins*, 32 A.3d 768 (Pa. Super. Ct. 2011), the Pennsylvania Superior Court reviewed a *cy près* ruling regarding a trust that was established for the benefit of a non-profit hospital. *In re Estate of Elkins*, 32 A.3d at 771. In that case, the trustee asserted that the charitable trust had failed because the successor to the non-profit hospital was a for-profit corporation. *Id.* The trustee

selected a non-profit organization of physicians serving the area previously served by the non-profit hospital as the appropriate alternative beneficiary. *Id.* at 771, 773. The Superior Court held that the trustee's selection "serves the precise community that Mr. Elkins desired to benefit when he created this trust." *Id.* at 778. The Pennsylvania Superior Court further emphasized that there was evidence that the non-profit organization performed "a variety of functions that were *historically* performed by hospitals * * *." *Id.* (emphasis added).

As was true with respect to our reading of *Town of Brookline*, we view respondents' reliance upon *In re Estate of Elkins* as unpersuasive. Just as the Pennsylvania Superior Court held that the non-profit organization was the alternative beneficiary that best fit the settlors' intent, the record in this case clearly establishes that Miriam Hospital was the most appropriate alternative beneficiary. *In re Estate of Elkins*, 32 A.3d at 778. Our review of the record reveals that Miriam Hospital is providing health care and is servicing persons who were previously served by Memorial Hospital. In particular, the evidence in the record reveals that residents once served by Memorial Hospital have been going to Miriam Hospital for emergency care. Additionally, as the trial justice pointed out, Progreso Latino, The Miriam Hospital Foundation, and the medical offices currently at the Memorial Hospital campus are not licensed hospitals in the traditional sense. Accordingly, it

is our opinion that the trial justice did not err in designating Miriam Hospital as the alternative beneficiary of the trusts.

CNE, Memorial Hospital, and Kent County Hospital also assert that the trial justice erred in not complying with the express terms of the Wood Trust, which called for the selection of "another charitable institution of a character similar to the original beneficiary located in the Blackstone Valley[12] as the recipient of the income of such share." We disagree. It is our view that the trial justice was correct in determining that naming Miriam Hospital as the alternative beneficiary best serves what he characterizes as the "predominant intent" of the Wood Trust settlors inasmuch as Miriam Hospital currently provides gratuitous hospital care to the residents of the Blackstone Valley.

The trial justice referenced the findings of the John Snow Report to the effect that Miriam Hospital is "the best-positioned facility to comport with the geographical boundary set by the Wood Trust and said trust's charitable purpose."[13]

---

[12] It should be noted that "the Blackstone Valley" is not a governmental entity in the usual sense. It is rather the term commonly used to describe the several towns and cities in Rhode Island and Massachusetts through which the Blackstone River flows. That river begins in Worcester, Massachusetts, and ends in Pawtucket, Rhode Island, where it flows into the Seekonk River. *See A River Shaped by Ice, Industry, and Renewal*, Blackstone River Watershed Council, https://blackstoneriver.org/about/our-watershed/.

[13] It is of some significance that Miriam Hospital is approximately 2.7 miles from the Memorial Hospital campus.

As the trial justice found, designating Miriam Hospital as an alternative beneficiary comports with the charitable purpose of the Wood Trust—namely, the provision of gratuitous hospital care. Furthermore, evidence in the record shows that Miriam Hospital has been increasingly servicing residents of the Blackstone Valley following the closure of Memorial Hospital, especially for inpatient care and emergency services. We reiterate that Miriam Hospital is therefore the entity that is most closely fulfilling the dominant intent of the Wood Trust—namely, providing gratuitous hospital care to the residents of the Blackstone Valley. Accordingly, the trial justice certainly was not clearly erroneous in concluding that Miriam Hospital is the most suitable alternative beneficiary since it comes closest to fulfilling the dominant intent of the settlors of the Wood Trust. The trial justice's ruling in this regard is a laudable example of what the *cy près* doctrine is meant to achieve.

Finally, the Attorney General seeks clarification as to whether the proceeds of the trusts are to be used for the purposes of inpatient and emergency care or if they are to be used for "gratuitous hospital care more generally." It is our opinion that the proceeds of the trusts are to be used in the manner in which Miriam Hospital sees fit within the parameters which we have explained in this opinion—namely, the provision of inpatient care and emergency care.

# V

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

Justice Goldberg and Justice Long did not participate.

**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Bank of America, N.A., as Trustee of the Harold W. Wood and Gertrude B. Wood Trust, the Marion Law Trust, the John F. Preston Charitable Trust, the E. Russell Richardson Trust and the William F. Sayles Endowment Fund v. Peter F. Neronha, Attorney General of the State of Rhode Island, et al. |
| **Case Number** | No. 2024-30-Appeal. No. 2024-31-Appeal. (PM 22-4462) |
| **Date Opinion Filed** | February 20, 2026 |
| **Justices** | Suttell, C.J., Robinson, and Lynch Prata, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Brian P. Stern |
| **Attorney(s) on Appeal** | For Petitioner: Steven E. Snow, Esq. |
| | For Respondent: Mitchell R. Edwards, Esq. Robert D. Fine, Esq. Julia Claire Harvey, Esq. |